All rise. The Illinois Court Third Division is now in session. The Honorable Justice Kevoi K. Martin, Jr. is presiding. Good morning. You can see he's a gentleman, right? You can see that. Thank you. I'm going to have her tell my wife that. Good morning, ladies and gentlemen. You're going to call the case here first. The lawyers who are going to argue, will you please identify yourselves for the record? Good morning, Your Honor. My name is Kathryn Oberer. Could you stand up, too? Yes, of course. Thank you so much. I didn't hear you last night. My apologies. My name is Kathryn Oberer, and I represent Dr. Willie McMiller. Thank you very much.  You're from the AG's office? Yes, Your Honor. Assistant Attorney General Nicholas Miller on behalf of the people. Very good. Thank you. Now, it is our normal custom and habit to allow 15 minutes for argument. And with that in mind, would you care to reserve some time for rebuttal? Yes, Your Honor. Thank you. I'd like to reserve five minutes. That's very good. And, of course, we'll make certain allowances as a result of questions that may be asked of each of you. And with that, you may begin. Thank you. Good morning, and may it please the Court. My name is Kathryn Oberer, and I represent Dr. Willie McMiller. This is an appeal in a theft and vendor fraud case for improper Medicaid billing. The problem with these convictions is that my client, Willie McMiller, is the doctor. He's a child psychiatrist who cared for children for decades. And his job did not include billing. He hired someone to do that. The state actually charged that person as a co-defendant. They pleaded guilty. And so the state has successfully prosecuted someone for the improper Medicaid fraud in this case. But its prosecution of my client was deeply flawed. The briefing talks about eight different types of problems with the convictions, requiring reversal of conviction outright, a new trial, or the reduction in his prison sentence. And today I'd like to focus on three of those types of problems. First, Your Honor, should reverse my client's conviction outright because he's the doctor, not the biller. So the state did not prove that it's his guilt. Four, Your Honor, should order a new trial because of the improper jury instructions in this case. Four, Your Honor, should order a new trial because of the improper hearsay that was admitted. The Medicaid bills in this case were not actually admitted. Instead, the state offered police-created spreadsheets to prosecute my client, and those were inadmissible hearsay. What about the issue that he oversaw or supervised the individual that was taking care of the finances? Would the director tell her, you know, where to – how to bill, who to bill, and then also in terms of the proceeds, how they should be distributed? Some of that, Your Honor, is incorrect. My client did hire a financial coordinator to bill in this case, but he's not actually the person who trained her how to bill. She was trained and taught to bill by another employee. So she had her own credentialing and her own training. So that person is the person who did the acts for the billing in this case. So that's what I do want to clarify. But he is a supervisor, right? And he's supervisor, director in terms of who to bill and not to bill? The evidence in this case is that the other employees at my office submitted attendance records to the co-defendant whose job it was to bill. Then she spoke to my client, the doctor, and got procedure codes to figure out what type of treatment he provided. And then she was the one who actually submitted the bills to the state and actually requested Medicaid funding in this case. So that's why I'm arguing that my client did not control or obtain the money in this case, and the state did not prove that he was principally responsible. I'm hearing what you're saying, but wasn't her testimony that she only entered what he told her to enter? That's correct. I do want to clarify, though. They charged my client as the principal, the person who was taking this money, and they didn't ever prove that he did that. That's the only theory of guilt they submitted to the jury, that he's the one that took the money, but she was actually doing it. Did they have to prove he took it or that he just exerted unauthorized control of it? Did they have to actually prove that he got it? And if they had to prove that, doesn't it go into his accounts? Meg Miller or something, I can't think of the LLC, but it goes into his account and the checks are endorsed and the money is, in fact, paid. The evidence of all of that, I do want to clarify, controlling or obtaining the money is an element of all of the offenses in this case. The money, so they had to prove control. They could do that, that he took the money. They didn't do that because he's not the biller. They could prove that he personally possessed the money, but they didn't do that. It didn't go to him personally. It went to his PO box, did it not? A holding company PO box for a business? Yes, yes. Put his name on it. He did set it up, yes, but there wasn't any evidence of who went to the PO box and took that money. Your Honor's mentioned that the checks were endorsed, but there wasn't any evidence of who actually endorsed them. There also wasn't any evidence of where the money was deposited, what bank account, who accessed it. And, again, my client's the doctor who saw patients. He's not the financial coordinator for the office. It wasn't part of his job to be controlling the finances, and him being the principal who did those things, who had control over the money, is the only theory of liability that the state submitted to the jury.  It's defined by statute, the taking or carrying away, the sale, conveyance, or transfer, or possession of property. That's in the 720-ILCS-5. That's how the statute defines it, but how would you define it in these circumstances? According to the statute, Your Honor. So didn't he carry it away in one manner or shape or form? Maybe he didn't personally carry it away, but he did carry it away. There's no evidence of that in this case, which is why we're asking, Your Honor, to reverse the convictions outright. I have a question about the single intention in design. Yes. Okay. So it seems a little confusing in terms of your argument, because there is evidence that there was a lot of defrauding of the government in various ways, but yet you suggested there's no single intent in design. Yes, several different ways is the point to focus on there. The way the state charged the offenses in this case, they're serious because of the large amount of money involved. There wasn't one act by anyone, either my client or the court defendant, that took all that money. They took a bunch of different acts and grouped them together to elevate the offense. To do that, they had to prove that they were part of a single intention or design, which is defined as an identical scheme for taking money. To defraud the government of money. Yes. I think that's a single course of design, to defraud the government of money, whether it's by billing patients that never existed, by billing patients for, what, 24 hours, by billing patients who are in the hospital or in jail. The single design is to defraud the government. The scheme that you're describing is different ways of doing things improperly. So it's not identical. To arrive at the same result, the theft of the money. A lot of different acts, different ways. I do think it's different than the people versus more, which defines it as an identical scheme. That is one of the arguments I raised, that there's not enough evidence of that element. But I do at least think it's close because of the different ways that Your Honor is describing, which does bring me to the jury instruction issue I want to discuss. It's an element that this was all part of a single intention or design, and the jury never got an instruction on that element. It wasn't included. There was no objections to the jury instructions. That's correct. Yes, these jury instruction issues are not preserved. The state and I agree on that. There is reversible error. However, under ineffective assistance of counsel, if we're not actually holding the state to its burden and making sure that the jury got the instructions on all of the different elements, or Your Honors could review it for plain error. Under first or second prong error, or both, which one are you saying? Either one. To go back to the single intention or design element, it's close whether it was part of an identical scheme because the evidence that the state offered was that money was taken in lots of different ways for lots of different reasons. So it's close whether that was an identical scheme. You said for lots of different reasons? Yes. You mean it's only taken in a lot of different ways? Yes, exactly. The one reason is to get the money. Taken, it has to be an identical scheme, is the language from people versus form. So there's differences that Your Honors are describing. That is only one of the problems with the jury instructions. They were also missing a second element for the theft counts. The mens rea of knowledge was not included in the definition of those offenses for the jury, so they weren't told that that was something they had to find when defining the offense. It also requires a new trial. The state doesn't dispute that that was error. The jury also did not get a pattern instruction of what it means to control or obtain money, which Your Honors was asking about before the instruction. It's from the statute. It's also in IPI 13.33D that tells the jury what it means to control. They didn't get that. That was an error. The state doesn't dispute that. There were two more problems with the theft by deception count. The jury didn't get the proposition instruction at all for that account, which is the instruction that tells them the state has to prove the first proposition or element and the second one and the third, all beyond a reasonable doubt. Otherwise, my client can't be found guilty of that offense. The jury just never got that instruction. And they also didn't get the definition of what it means to deceive. That's another pattern instruction the jury should have gotten. In all five of these errors, the state doesn't even dispute that they were errors. They don't dispute that the instruction should have been given. They don't dispute that it was an error not to give them. And Your Honors, they're not preserved, but there are three different ways you could review it. Let me ask you one question before we go into that. Yes. They're going to argue that there was an overwhelming amount of evidence. So, you know, if an instruction was faulty in one way or shape or form, it really wouldn't have made a difference. I'm paraphrasing what their argument is. I don't know if that's going to be their argument. I would disagree with that because of the importance of the jury instructions. It's very clear that counsel is ineffective for not requesting instructions on elements. People v. Pecker on the Supreme Court case said in the brief, there's even another instruction discussed later in the brief that the state doesn't dispute was an error. They weren't instructed to view the codefendant's testimony with suspicion. That encompassed instruction. It's very clear right in the comments of the instruction that counsel is ineffective for not requesting that instruction. People v. Campbell, the state doesn't dispute that, doesn't discuss it. So that's the first prong. And when you have a situation where the jury isn't being told to scrutinize the evidence from the codefendant, where the jury isn't being told all of the evidence that the state has to prove to meet its heavy burden to find the client guilty, where they don't get instructions of what it means to control state money, all of that is prejudicial. And it distorts the state's burden in this case. And it's improper and it requires a new trial for ineffectiveness reasons. Or if you're on a side that closely balanced, it could be first prong, plain error, or second prong, which is something that this Court finds all the time when elements aren't given as part of the jury instructions. It's people v. Ogunsula. I know you said we find it often. I apologize. We take that back because we hardly ever do. It does happen when there aren't objections to instructions of elements and of essential definitions of offenses. It occurs as a second prong, plain error because of the severity of not telling the jury what they need to find, what they need to prove to convict a person and find them guilty and deprive them of their liberty. If there are no further questions on the jury instruction issue, I did want to talk about one of the hearsay issues in the brief, Issue 4A. The state didn't actually offer any Medicaid bills in this case, which I mentioned at the beginning. Instead, they offered these police-created spreadsheets to say that billing was submitted, that billing was paid, that those bills were paid improperly, and that is inadmissible hearsay. Isn't the evidence derived from his own online, what he had on the computer, in terms of the bills that were paid and were not paid? Didn't they derive that from the doctor himself? No. From his office, you'd say? No. There were lots of different things that were done to create these spreadsheets. Again, the co-defendant is the one who submitted the bills through a program called MediSoft. Then the evidence is that those bills are processed through two other computer systems, the Medicaid Management Information System, and MIS. It's referred to in your records. And through the electronic database. So what I hear is not that the law enforcement created the information. They obtained the information from the doctor's computer, did they not? They didn't manufacture this out of whole cloth, did they? I'm referring to the spreadsheet.  The information that's contained within the spreadsheet, where did that come from? Through different computers. The co-defendant's billing through the MediSoft program is what they submitted. Then the state reviews it, they said, by a computer through those two programs I mentioned earlier, that MMIS to the EDW was the evidence of how they determined what to pay from the bills that were submitted. Then a police officer who works for ISP, James Mitch Davis, said that he ran additional queries on this data to go through 2.4 billion data points to run this system called B1 Query and to select out pieces of data that he thought were relevant and important to compile them into these charts to make conclusions about whether those bills were paid properly or not. And those spreadsheets were specifically created to prosecute my client. And so they're hearsay. This is specifically stated by statute, 725 ISDS 5-115-5, section C2. That's law. Basically what it says is that if you create something to prosecute someone, that it's not a business record, and that's the only hearsay exception that the state offered to try to get them in. In this case, so it's hearsay. I have, I guess, a problem with your definition of create. Yes. If they import data, which is I think what the officer did, import data from these different machines onto a spreadsheet, how is he creating it if he's just taking the data and putting it on a demonstrative exhibit? It's not a demonstration. The bills themselves are never omitted. It's not like he compiled other bills or anything like that. I know not the bills themselves, but, and I have to of course look at the record. Yes, please. But I thought there were these, there's I think three different computer systems that are involved. One, two, three, six at least. Okay. Yes. It's all the systems that are used in what I remember reading about this, all the data that is on the, I feel like I'm trying to remember his name. Is it Lewis or is it Davis? James Lynch Davis, the police officer that created this. Right. Yes. I keep using the word created. Yes. But did he actually create anything other than taking data from these various computer systems and putting them onto one sheet? Did he change any numbers? Did he, anything like that? Or is it just importing data from computers that are used in the ordinary course of this business? The spreadsheets that are created, they do not exist in the state of Illinois' computer system and they would not exist for this prosecution. So that's what I mean by created. You also, Jeremy McClung, the person who- But you didn't, just, I need to know, are you saying that he created, other than putting this data on the spreadsheet that you say doesn't exist in the system, did he create anything other than taking figures from one computer system and putting them onto this spreadsheet? He said that he went from some data submitted through MediSoft, then through the MMIS, then from the EDW, he selected from 2.4 billion data points, he ran some sort of query called the B1 query to select things out that he wanted and to compile it and to make conclusions based on that. And was it based on the, I thought, yeah, I mean there's a lot of record here, but I thought he did 11 different, I thought he did like 11 different patients. That's part of it. But he pulled the data from those 11 different patients, maybe the patient that was in the hospital or that was in jail. It was, yes, he didn't take 2.4 billion data points. I don't think anyone was in jail. I thought there was a testimony that somebody was in jail. There were records that were selected, formatted, and put into a spreadsheet to create conclusions for 11 different patients. Then there were spreadsheets created for when he thought that the office was actually closed. That's Exhibit 29. Then there's spreadsheets David created for when he thought people were getting other treatment at other places, like in the hospital. Those are all the types of spreadsheets that just wouldn't exist. But for this prosecution, it's very – I think Justice Lamkin was making reference to the fact that there was a woman who testified that there was billing that took place when her son was in the juvenile detention center. I know somebody was in jail. That's – I don't recall it. You don't recall that? I'm not going to – Certainly not. Just to make it clear, that's what Justice Lamkin was working on. Yes. And the point is that you keep on saying created. Right. The point is that Davis derived all of this information from the doctor's own computer. His niece, who was the one in charge of the finances, provided him access to the computer, and he got all of this information from the computer. So it's coming from the computer. He didn't pull this stuff out of thin air and say, well, I'm going to put this person's name or that person's name or go into files. It was all on the company or the office's computer. That's how he derived this information. So I think you're being a little disingenuous by saying that he created it. It was already there. There's two points. I don't think that the court offended the biller, like gave Davis access to any computer system. There wasn't evidence about that. It was that she submitted bills, and then the state processed them, and then they made decisions about whether they thought that was appropriate or not. I guess the analogy I would create or would suggest is it's like a police report. When the police decide they want to prosecute someone, they talk to lots of different people. They maybe do some investigation. They collect evidence from lots of different places, and they put it together in a police report to say that a crime has been committed, and that's the Gaten case, which I cited in the brief. It says that that's not a business record because it's created to prosecute someone under the statute. It's not exactly the same. That's not exactly the same thing. But, please, why don't you go on with your argument? Yes, I did want to say those spreadsheets are there. We maintain that they're hearsay. It was also improper for Mr. Davis to testify that they were losses. Again, he's a police officer making conclusions. That's Issue 5 to touch on that since it ties with these. It's improper for him to say that the Medicaid billing was improper, both in his testimony and both in the incident. Wasn't he considered an expert? This is a separate point from that. There's several cases, People v. Crump, People v. Suggs, People v. DeVua, which say it's too prejudicial when someone makes conclusions for the jury on a fact issue that a crime has been committed. That's just too prejudicial to admit the expert or not. There's also a case, People v. Nuwadi, which is another theft and vendor fraud case, which is the same charges we have here. This is when you're admitting exhibits that are making these same conclusions, that there is a loss, that a crime was committed, that the billing was improper, that that's just too prejudicial to admit. So that's just a separate issue from what type of witness he was. And that's Issue 5 in the briefing and another reason your honors should order a new trial. And if there are no further questions, I would reserve time for rebuttal and ask your honors to reverse the client's conviction. Absolutely. Thank you. Good morning. May it please the Court, Counsel. I'm Assistant Attorney General Nick Bowler on behalf of the People. I think I'd like to start with the weight of the evidence here because really that resolves almost all of the claims from sufficiency, where it is the question, to all the evidentiary errors, which would be harmless if the evidence is overwhelming, and the ineffective assistance because there can be no ineffective assistance where the overwhelming evidence means there was no prejudice to defend it. Well, before we proceed, I have a question that I think would answer a lot of the questions that we have. So why didn't the state present evidence that the defendant personally received Medicare funds? The answer is not in the record, your honor. The state had access to bank records. The bank was no longer in business, and that created evidentiary complications. That's not in the record. So how do we know that the police didn't sign all this stuff and hide the money? The difficulty there is it benders common sense to come to that conclusion because we're talking about the sole Medicare provider at this company owned by a defendant. Ninety-five percent of his psychiatric treatment is this Medicare business. All of that Medicare business, both the legitimate work he was actually doing and the fraud work, was not separated out by the state. The state didn't know it was occurring. So all of the Medicare funds, both for his legitimate business and his fraudulent business, were coming to one place. That's the place the defendant directed the state to send it to the person in business he directed them to send it to, and that's his name at the top of the checks on the company he was doing business as. So he is exercising direct control in that he is telling the state where to send these things. They are sending it where he told them, and these checks with his name on it are getting endorsed. The question then becomes who else could have been taking this money? Because if it was the niece somehow taking the money, there's been no explanation how she could have gone through all these commingled funds of his legitimate business and the fraudulent business and somehow taken out the fraudulent parts without him recognizing it. This is 95 percent of his treatment business. This is a company, they say, he looks through everything. He is in charge of how could this educated individual not recognize that this large amount of money was going from the checks he was getting based on what makes up most of his business. So while there was no show that there was actual possession of the checks directly, the circumstantial evidence makes clear that these checks going to where he asked them to be sent for the work he said he was doing and includes his income outside of the fraudulent part the only reasonable conclusion is defendant is the one endorsing those checks. Defendant is the one getting money because otherwise why is he asking no questions that he's not getting his how does the niece get to that with his name on the checks? Why does he not notice all that money is going and how is she able to sift through it and give him what's legitimately his and not the fraudulent things? All of that circumstantial evidence leads to the conclusion beyond a reasonable doubt certainly taking inferences in the favor of the state that he was receiving these funds. Was it ever actually established that he was endorsing the checks? There was no handwriting expert. I personally, looking at the record, I can't tell you what the name says. I can tell you that the front of the check at the top line by itself is listed his name and in my experience with checks, a juror's reasonable experience with checks, the person endorsing a check has to be the name on the front of it. Beyond that, it doesn't matter if he takes control of the checks because the evidence is clear. He knows what's going on. William's unrebutted testimony was that all the numbers she was putting into the system, she was getting those directly from defendant. She did not bill a thing. She did not put in a Medicare code, person, or date that he did not tell her to do. He did this every week. So he must have known that these numbers he was giving her, that the unrebutted testimony shows she was putting in at his direction, were not true, that he knew this was fraudulent. Because if we look at the outliers of how he was initially brought up on the mind of the investigators, he was billing in a four-year period. He billed slightly less than 800 days of more than 24 hours a day. If you work that out, that's just under every three days, and then the fourth day would be legitimate or be at the very least not billed for more than 24 hours. The people he was supposedly billing for, the numbers he was giving there, they said they never got the treatment. Some of them had never met him, and at least one of them was one of his current employees. He knew, and so this person he was billing for, he somehow, to not knowingly have been doing this, would have thought he was treating his employee despite the fact that she said he wasn't. And then, again, it comes down to a question of what is the crime here. The crime here is not who pressed enter on a Medicare software. It's not who sent the electronic envelope putting defendant's bad numbers into the system. It's who exercised control over the money. And one of the ways defense counsel, I'm sorry, opposing counsel, mentioned was one of those ways is if they had the money transferred, if they caused the money to be transferred. And when we heard from the witness, it was defendant who set up this Medicare situation. It was defendant who told them who and where to send it, and then he's giving the numbers to do it, regardless of who gives the electronic envelope containing his numbers. He has directed both him and through his selections for Medicare system of where to send that money. He is providing the control. He is having it transferred to where he is. It's still theft. It's still Medicare fraud if I take the money, but instead of actually taking it, send it to my poor mother or my brother or some friend. If I'm the one directing, if I'm the one giving the bad numbers and telling them where to send the money, it does not matter that it's coming directly to me because I'm exercising control over it. I have a question because your counsel for the defendant said the control is defined by the statute, but yet at the same time she's arguing that there was no control here by the defendant. Yes, sir, and one of those statutory definitions she used was it said transfer. Right. And that has been controlled. That is one way to control the state is relying on. The state also believes there was enough evidence here to believe the defendant was the one actually possessing the checks. They had his name on them, sent the PO box he wanted them at, and they were then endorsed. The reasonable conclusion there is that the person endorsing the checks is the person on the front of the check. The person picking them up from the location Mr. McMillan said he wanted them sent is defendant. Was there any evidence presented to show that he derived a benefit from these ill-gotten proceeds? I mean, we know, okay, so the checks went to the PO box, but yet at the same time, you know, where did the proceeds go? There's no direct evidence of, say, him making large purchases or other way. What would have happened with the money, but that's not an element of the statute. Again, I think that ties into the fact that this is all coming in a lump sum for his sole-owned business, does then lead to the fact that if it's coming into your business for your psychiatric treatment, he's the only one there doing Medicare treatment, it must be for his at the very least income. But that's not part of the statute. It's just, like I said, it's still theft if I commit fraud and send it to someone else. Send it to your eye and hold it in your underwear? Yes. Wherever you send the money, it's the sending it, it's the causing it to be transferred, exercising control in that way, whether or not you actually get it. I'd just briefly like to touch on furtherance of single intention in design for evidence-wise. Opposing counsel keeps casting us as if this was a million different ways, a million different ways of what happened. That's not true. There are a million different ways the State caught what was happening. But in each instance, it was the same thing. Defendant was billing for services that were not rendered. Some ways the State caught that the service he said he provided but didn't were because people came forward and said, we didn't get that. Other ways were the State looked and said, hey, those people you said you were billing for, they were in the hospital at the time, but it was still the same act of I billed, I said I was doing a service that I wasn't at the time. So the act is the same over a three-year period we're talking about. The victim is the same. It's the State. And the goal is the same. It's to recover this ill-gotten money. To answer your question, Your Honor, I believe there was one individual who, as part of the witness saying, my child never received services. One of the ways she said she knew was because he had been detained in some fashion. That doesn't play largely into the State's argument because if you look, the State can get to that magic number of $100,000. It would dial over to most of the evidence because just talking about evidence where witnesses themselves, witnesses or their parents said that never happened, that gets you to over a quarter million dollars. If you drop it just to witnesses, don't say I didn't do that service but said I never had any service from defendant, that still gets you to over $100,000. So with a lot of these evidentiary errors, with the question of the flyers, the hospital, things like that, those are harmless too because we don't need them. The State has the witnesses saying I never met the man, I never received treatment there, and that gets the State to its magic number. Even without the flyers you're saying? I'm saying without the flyers, Your Honor, without the hospital. I haven't done all this math that you have done, obviously, but I know there's flyers that say we're off on holidays and certain things like that. Yes, Your Honor, I believe the State does a list in their brief, but I believe there are six individuals who make the claim that they just never received any treatment and not, whereas there were others that said that we started but then stopped or we got some things but not others. But just solely the people who said we didn't do it or we didn't have any treatment, that gets you over $100,000. And I should point out, despite all the evidentiary objections, the defendant has never raised an objection to the math here. It's never been a question of was the data put forth that's now called hearsay and correct. It was never a question of did Davis get his math wrong. There's been an objection to that because he got the math correct. Going on to, I would like just on the evidence to clarify one issue I heard. The way these, the claims data, the spreadsheets, I'd first like to note there's two different kinds of spreadsheets. There are one that's just pure data gotten from the State, and there's another that's that same spreadsheet but then the expert added a column on saying losses. The State acknowledges that those spreadsheets that are separate, that copy and then add a column, those were only entered as demonstrative. They were only able and published to the jury as demonstratives for the expert to explain his opinion. So that's not what we're talking about with hearsay. What we're talking about with the evidence relied upon, the potentially hearsay documents, is these spreadsheets with the data that comes from the State. The way that data is compiled based on the record is that providers, like the learning centers in this case, send in their billing, their data, what we'd like to bill for, who it is, how much money we'd like, and what the code is and things like that. That goes to the State. The State then does its process of people looking at it, people saying whether or not it's going to be approved, how much it's going to be approved for. They then tell the defendant, and those numbers then get sent to a digital warehouse largely. So where the expert got these numbers from was not from defendant's computers. That was different things seized in the search. The Davis numbers come from the State's warehouse, which is maintained by the department in charge of dealing with Medicare, or at least at their direction. And so that's where those numbers are coming from. And those numbers are just, as they sit now, not being pulled, ones and zeros sitting in a database. I don't know a great deal about computers, but I know that what's sitting in the State's database, where these numbers are being pulled from, is just data. Not translated, not being changed into anything. It's just a warehouse for digital things. What the expert then did was they made requests of that data and used a program not to change the data, but to make it readable, because they didn't know it sits as ones and zeros, and somehow you have to get the ones and zeros into numbers and words that we understand. So Davis did not create anything about the hearsay statements. The hearsay statements, the statements for the truth of the matters asserted, what matters here is this number was billed, this number was paid, and the other procedural codes. Those are the numbers that exist. They exist in the database in some form. All Davis did is take that data and put it through a program into something that was readable, that did not change the numbers. And again, counsel and defendant have made no objection that those numbers were changed or that those numbers were inaccurate for what was billed, what was paid. I think what they're arguing, though, if I understand their argument correctly, is the exhibits showing the loss amounts. You know, if I understand their argument, what they're indicating is that that's for the jury to determine, right? And to have those exhibits showing exactly the loss amount for each individual, so on and so forth, is removing that from the prior effect. You're kind of leaving the prior effect as to your conclusions. Yes, sir. And if that is their argument, then they're not talking about the first group of spreadsheets that I'm talking about, the ones that were actually entered as substantive, because they don't have the loss amount. So that argument has nothing to do with those coming in as business records. Well, you're saying that they're only on the demonstrative exhibit. So I forget the numbers, so I don't want to confuse. But there are, say, 20, somewhere around that amount of exhibits that have been basically copied into the same type of exhibits. These copies, the ones I'm calling demonstratives, then had an additional column that had the expert's conclusion of loss. But the ones that were entered into evidence as substantive evidence, they do not have that column that says loss. They do not have anything other than the data. So that is the one that the hearsay matters about. Because for the demonstrative, that was not entered as substantive evidence. That's a demonstrative of an expert explaining what he did. And therefore, the hearsay part there doesn't matter, because the part that is different from the first set, the evidentiary set, the loss, that's not a hearsay statement. That is him directly explaining what his conclusion was. So on the hearsay level, that type of argument, Your Honor, about that loss column, doesn't matter to the substantive exhibits. When we get to the ones that are demonstratives, the rules for a demonstrative just have to be that they are helpful to the jury and that they are not overly prejudicial. There's been no question about the math here. There's been no question that the numbers were correct. So how can there be any undue prejudice to defend it? If the argument is, well, they go directly to an element of the case, the ultimate question, that's not actually an evidentiary objection that works here, because we're talking about an expert, and the rules explicitly say that experts are allowed to give opinions as to the ultimate question. So there is a rule, I apologize, I believe it's 701, but there is a rule in the briefs that explains that as long as Davis is in there as an expert, he can testify to the absolute, the question. And he was an expert because of his training and experience working in this particular area. Yes, and he was ultimately qualified as an expert because he has over 20 years of experience. He's certified, he's dealt with these things, and we get down to the question of whether an expert is admissible or not. It's just a question of, again, similar to demonstratives, would they help the jury and do they have knowledge beyond the average white person? Here his expertise was put forth, and when we're talking about an expert, whether they're qualified or not, this is abuse of discretion. So it's a question of whether the trial court, in accepting this man who's done this work for 20 years, who is certified and has had this training, was the trial court irrational in accepting him as someone with information beyond that of an average person? And in the question of was he helpful to the jury, he did a bunch of math with a lot of numbers. That's helpful to the jury. I don't know of a more straightforward, does that help the jury? But to the extent that it's not, it then becomes a matter of harmlessness. Because once again, the math was all done correctly. At least any argument it wasn't has been forfeited because it wasn't raised. So if he did the math correctly, if you take his testimony out, then all we have is the jury having to do all that math itself. Now, that may have taken longer in the jury room, but the jury still would have done math and gotten at the same conclusion. And so there's no error there. Any error in him not being admitted, in the demonstrative not being admitted, would have been harmless. So unless there are further questions on that, on the hearsay issue. No. Just a little bit on the jury. I would like to turn to the jury instructions, Your Honor. I'd like to note that the state qualifies or groups the instructions questions in two. And that's because this first group of instructions are actually waived under Supreme Court precedent. And the second group are only forfeited. The big difference there is that waiver borrows a plainer overview. And so for the instructions about lacking in furtherance of a single intention in design, lacking the knowing element, or that the vendor fraud that misstated the law, the arguments put forward by the defendant, defense counsel in each instance said affirmatively no objection. And that is not failing to object. That's not staying silent. The Supreme Court has been clear that when you actually say something like no objection, that is affirmative acquiescence. Affirmative acquiescence is a waiver. And therefore, those groups of jury instructions are just beyond review. But should the court disagree with me, I would note that the same harmlessness arguments apply. The same fact that this evidence is not closely balanced applies. But then I would turn to the forfeited, which we appear to agree on. So these errors, if they are errors, have to meet one of two standards. Under plain error, they either have to be the evidence was so closely balanced that any error would have tipped the scales. And I believe I have addressed that ad nauseum, one might say. So unless there's a question on that first prong, I would move on to the second prong. The Illinois Supreme Court has been quite clear about what constitutes second-prong plain error with jury instruction. If you look back to the case Tannenbaum, the court noted it is not second-prong plain error, although I believe they used slightly different language, but later cases have said that's what they're talking about, the second-prong plain error. It's not second-prong plain error to omit something. It is only second-prong plain error if you misdefine, if you have two contradictory things about an element. And then we don't know which one the jury followed, and that's why second-prong plain error happens. In fact, the case cited by the defendant makes clear, Ogunsola, they had there a misdefined element and said Tannenbaum is still good law. We're not overruling Tannenbaum. They made clear in the case they're citing that when you're talking about the omission of an element, that's not second-prong plain error because you can apply harmless error review to it. It's easy to say it doesn't matter if the jury is told the definition or the element itself if the evidence on that element was so clear that any jury would have found the defendant guilty. And here, if we're talking about deception, there was no closely balanced, there was no real dispute. Yes, that any deception occurred. And so the defendant argued that it was, that deception does happen and the fraud was happening, it was just someone else doing it. And so on the question of that element, it's clear it was harmless because there's just no real dispute that bad numbers were given to Medicare. The dispute was on who had control of the proceeds of that. And so it's not second-prong plain error. It's clearly subject to harmless error review. If you take it through the lens of ineffective assistance, it's still not error because there's no prejudice, there's no reasonable likelihood that had counsel objected, had different instructions been given, that the jury would have come to an acquittal because here the evidence is clear. Over, at least over a quarter of a million dollars in false claims, the checks went to defendants at the address defendant gave. It was most of his business. There's just no close balance. There's no question that a reasonable jury could have found it. There's no question that there's no likelihood the jury would have done differently. So it must have. I just have a question in terms of the trial itself. Did the receiver testify that he knew what she was doing in terms of transactions and so on? If I understand correctly, Your Honor, I don't. There's no testimony where the witness says he knew this. That would be problematic. That gets to speculation and probably would have been objected to. There is the circumstantial evidence of her saying I only did the numbers he told me to do. So, yes, there's not the witness saying he took them off each element, including knowingly, because she couldn't have. All she knows is he gave her the numbers to bill. She didn't get the money from, she didn't pick up the checks because, as she said on rebutted, she never got paid by the comptroller. She only got paid by defendant. And so even if you look at the exorbitant amount that was given to Ms. Williams, that came from defendant, which goes to your question of what was defendant doing with the money. So unless... I almost smiled. I was just thinking, oh, my God, to go from $79,000 to $139,000. Four years is like a $80,000 increase in salary or something. And the only testimony of how she got it is Williams, who said the defendant paid her. One other question. So my understanding is that you did concede that there was a one-act one-crime violation, correct? Yes, Your Honor. As to the theft, there was clearly a one-act one-crime. I would note it's not directly tied into the harmlessness error, but given the one-act one-crime violation, one of those thefts goes away. If the deception... So if that goes away, the question then becomes, well, what happens? If this court rules that one of those theft counts was gone, if, for instance, the deception, theft by deception because of the jury instruction, if that gets rid of the theft conviction, then we don't have a one-act one-crime problem, and so it comes to the same result of one of the thefts is vacated. It's just there's no longer a one-act one-crime violation because there's only one conviction. So if that clears up Your Honor's question.  Then we would ask that you affirm the judgment of the trial. Thank you. Thank you. Thank you, Your Honor. I do want to start at the beginning again with the sufficiency issue and clarify. The State is saying that my client directed other people to do things. That's not principal liability. That could maybe be accountability, but they didn't present that to the jury. If they wanted to say that he was directing other people to do things personally, there's a way to do that. Use the accountability instruction, IPI 5.03. If you want to say that a person is directing a company to do something and they're accountable for that, there's an instruction for that, too. It's IPI 5.11. So that's just a completely different theory of guilt that was not presented to the jury in this case, so it's not proper to affirm on that basis on appeal. The things that the State is mentioning about some bank accounts that exist or not, where money went, who picked up checks, that just wasn't admitted at trial, so it's not proper to be considering that evidence to support the conviction either. Thank you, Your Honor. If there are no other questions on the sufficiency issue, with regard to the jury instructions, this waiver argument just doesn't apply at all to a claim of ineffective assistance of counsel. It's very clear. It's a Supreme Court case, People v. Pegram, and then that case, People v. Campbell, I mentioned earlier, which is actually cited right in the jury instructions. It says you're ineffective for not requesting instructions. I also want to clarify that not objecting to a jury obstruction, if you want to do the plain error analysis instead of the ineffectiveness, that's not waiver. You can look at People v. Herron. There's an instruction there in the facts that was offered by the State. The defense counsel said no objection, and it was still considered for plain error. So that's something that's very commonly considered for plain error, so you could also consider that as well. These aren't instructions that were offered by defense counsel. They were instructions that were offered by the State, or just were not requested at all. Getting into some of the QSA issues, the State seems to be suggesting that evidence wasn't offered for the truth about loss amounts, that there's some sort of non-truth demonstrative or summary purpose about what bills are submitted and what bills are paid and whether things were lost or not. That's inaccurate. The State pointed to these spreadsheets in closing argument and said that's the evidence of guilt. In the report of proceedings, it's page 1198, pages 1201 through 13, pages 1215 through 17. They are the State's case against my client. They do not have the individual bills. They do not have even the co-defendant saying she submitted any individual bills. They do not have witness testimony saying that any individual bills were paid. They're relying wholly on these spreadsheets for the truth of the matter, and that just definitionally is hearsay. These other comments the State is making about experts or Rule 701, those aren't hearsay responses. The State has to comply with the rules of hearsay, and they can't violate that if they're going to admit evidence at a criminal trial and convict someone of a crime and deprive them of their liberty. So these things are just not hearsay responses. And if this Court has no further questions, I would ask Your Honors to reverse my client's convictions outright. He's the doctor, not the biller, or order a new trial or reduce his prison sentence. Thank you. Thank you. Do I have any other questions?  Okay, very good. Thank you both for being well prepared this morning. We truly appreciate that. And we will get a decision to you in a reasonable length of time. With that, we are adjourned.